UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAWN LANDAU,

                  Plaintiff,

-against-

GOOD SAMARITAN HOSPITAL, BON
SECOURS CHARITY HEALTH SYSTEM
INC., and WESTCHESTER COUNTY
HEALTH CARE CORPORATION d/b/a
WESTCHESTER MEDICAL CENTER
HEALTH NETWORK,

                  Defendants.

**COMPLAINT**

**Case No. 23-cv-7227**

**JURY TRIAL DEMANDED**

Plaintiff, SHAWN LANDAU, by and through his undersigned counsel, the LEGAL

ACTION CENTER, hereby states his Complaint against Defendants, GOOD SAMARITAN

HOSPITAL, BON SECOURS CHARITY HEALTH SYSTEM INC., and WESTCHESTER

COUNTY HEALTH CARE CORPORATION d/b/a WESTCHESTER MEDICAL CENTER

HEALTH NETWORK as follows based upon personal knowledge and information and belief:

## PRELIMINARY STATEMENT

1.      Plaintiff Shawn Landau, ("Mr. Landau") brings this action against Defendants

Good Samaritan Hospital ("the Hospital"), Bon Secours Charity Health System Inc., and

Westchester County Health Care Corporation d/b/a Westchester Medical Center Health Network

(together, "Defendants") to seek redress for their repeated discriminatory treatment of him based

on his disability of opioid use disorder ("OUD").

2.      Since 2019, Mr. Landau has been in recovery from OUD and is treated with

methadone, one of the three FDA-approved medications for opioid use disorder ("MOUD").

OUD and MOUD are both highly stigmatized. MOUD is the only evidence-based form of treatment for OUD and is essential for treating OUD. It is a life-saving medication that allows people to achieve and maintain recovery and significantly reduces the risks of overdose and death.

3.     Mr. Landau is a regular patient at Good Samaritan Hospital. Because he has OUD, on two occasions when Mr. Landau was admitted to the Hospital Defendants refused to administer methadone to treat his OUD, even though they knew he was treated with this necessary, life-saving medication. Defendants' refusals caused Mr. Landau to experience serious withdrawal symptoms, including nausea, cold sweats, vomiting, and anxiety.

4.     Mr. Landau also has the chronic condition of diabetes, which has caused numerous health needs, including serious infections to his left foot, for which he has sought treatment at Good Samaritan Hospital.

5.     On two occasions, because Mr. Landau has OUD, Defendants denied him home-based intravenous antibiotics via a peripherally inserted central catheter ("PICC line") needed to treat his severe infections. Defendants ignored that Mr. Landau was an appropriate candidate for a PICC line, instead telling him that he was a junkie, and it was Hospital policy to deny PICC lines to people with a history of substance use disorder. Unfortunately, the infections to his foot did not heal and eventually Mr. Landau's left leg was amputated below the knee.

6.     Defendants' discriminatory treatment of Mr. Landau reflects pervasive, stigmatizing attitudes against people with OUD that exist even within the healthcare system and present barriers to appropriate care for people with OUD.

2

7.      Defendants' denials of methadone and home-based antibiotics via a PICC line on the basis of Mr. Landau's disability violated Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, and the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq*.

8.      As redress for Defendants' discriminatory conduct and the resulting significant harm, Mr. Landau seeks declaratory relief, injunctive relief, compensatory damages, nominal damages, and attorneys' fees and costs.

## THE PARTIES

9.      Plaintiff SHAWN LANDAU brings this action and is an individual residing in New City, New York. Mr. Landau's impairment, OUD, substantially limits his major life activities, including caring for himself, sleeping, concentrating, thinking, communicating, working, and neurological and brain function, which are major bodily functions. Additionally, Mr. Landau has a record of disability—OUD—and was regarded by Defendants as having a disability. Accordingly, Mr. Landau has a disability within the meaning of federal and state anti-discrimination laws.

10.      Defendant GOOD SAMARITAN HOSPITAL (the "Hospital") is a not-for-profit hospital registered with the State of New York that provides medical services to the public. Good Samaritan Hospital is located at 255 Lafayette Avenue, Suffern, NY 10901. Good Samaritan is a member of Bon Secours Charity Health System and Westchester Medical Center Health Network.

11.     Defendant BON SECOURS CHARITY HEALTH SYSTEM INC. is a not-for-profit healthcare provider registered with the State of New York that owns and operates Good Samaritan Hospital. Bon Secours' headquarters are located at 255 Lafayette Avenue, Suffern, NY 10901.

12.     Defendant WESTCHESTER COUNTY HEALTH CARE CORPORATION d/b/a WESTCHESTER MEDICAL CENTER HEALTH NETWORK is a healthcare system serving the New York Hudson Valley with headquarters located at 100 Woods Road, Valhalla, NY 10595. It is the majority owner of and manages Bon Secours. Good Samaritan Hospital is a Westchester Medical Center Health Network hospital.

13.     Upon information and belief, at all times relevant to this complaint, Defendants received federal financial assistance, including Medicare and/or Medicaid reimbursements as payment for services rendered to certain individuals.

14.     Upon information and belief, Defendants agreed to receive funds from the federal government in exchange for promising to refrain from discriminating against otherwise qualified individuals with a disability ("the Contracts").

15.     Mr. Landau is an intended third-party beneficiary to the Contracts.

16.     Upon information and belief, the federal government has substantially performed its obligations under the Contracts, including reimbursements for Medicare and/or Medicaid, and was willing and able to perform its remaining obligations.

**<u>JURISDICTION AND VENUE</u>**

4

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state law.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Suffern, New York within the Southern District of New York.

## STATEMENT OF FACTS

### I.     Background

19.     Mr. Landau is a fifty-year-old man who is in recovery from opioid use disorder ("OUD"). He also has the chronic health condition of diabetes. Mr. Landau's diabetes has led to many recurring health complications, including cellulitis, sepsis, osteomyelitis, atherosclerosis, and abscesses.

20.     OUD is a life-threatening, chronic brain disease. Medications for opioid use disorder ("MOUD"), which include methadone and buprenorphine, are the only evidence-based form of treatment for OUD.

21.     Mr. Landau has been taking methadone through his opioid treatment program ("OTP")—the Lexington Center for Recovery—since March 2019. Through his treatment with methadone, Mr. Landau has been able to achieve and maintain active recovery.

22.     Diabetes is a chronic health condition that affects a person's ability to make or effectively use insulin. Mr. Landau has been receiving treatment for diabetes since he was diagnosed in 2009.

23.     One manifestation of diabetes is that bodily wounds have difficulty healing and frequently become infected. This creates an increased likelihood that people will need long term antibiotics to treat serious infections.

24.     Treatment of certain severe infections, such as bone infections, typically involves treatment with prolonged intravenous antibiotic courses administered daily. Outside of inpatient settings, outpatient parenteral antimicrobial therapy ("OPAT") is used to facilitate treatment with intravenous antibiotics, often via a PICC line.[1]

25.     Mr. Landau has had ongoing health complications for many years due to his chronic diabetes, including foot ulcers and severe bone infections. Mr. Landau has sought care for these needs from Defendants.

26.     Mr. Landau is a regular patient at Good Samaritan Hospital, which is his hospital of choice. Since 2017, he has received ongoing care from doctors affiliated with the Hospital who are familiar with his health needs and history. Good Samaritan Hospital is close to Mr. Landau's home. He intends to continue receiving care from the Hospital.

27.     Upon information and belief, Mr. Landau has received care through the Hospital approximately one hundred and fifteen times. Approximately five of those instances were inpatient stays at the Hospital.

28.     Because of his OUD, Defendants discriminated against Mr. Landau.

_____

[1] *See* Norris et al., *2018 IDSA Clinical Practice Guideline for the Management of Outpatient Parenteral Antimicrobial Therapy*, 68 CLINICAL INFECTIOUS DISEASES e1, e1 (Nov. 13, 2018), https://www.idsociety.org/practice-guideline/outpatient-antimicrobial-parenteral-therapy/#RecommendationsAbridged.

29.     Twice, Defendants denied Mr. Landau methadone to treat his OUD while he was admitted to the Hospital.

30.     Defendants denied this medication because it is used to treat OUD, a stigmatized disability.

31.     Twice, Defendants denied Mr. Landau home-based antibiotic treatment via a PICC line needed to treat the serious infections caused by diabetic ulcers on his left foot.

32.     Defendants denied this care because of Mr. Landau's history of OUD, a stigmatized disability.

**A. OUD Is a Highly Stigmatized Disability**

33.     OUD is a chronic and treatable brain disease.

34.     However, OUD is also one of the most stigmatized health conditions. Within the healthcare system, OUD is often viewed as a personal choice or moral failing, rather than a serious health need.[2] Illicit and intravenous drug use are associated with negative attitudes and greater barriers to accessing health services.[3]

35.     Research has shown that healthcare professionals commonly disregard the needs of patients with substance use disorders. In one study, healthcare professionals reported negative attitudes towards patients with substance use disorders and lower regard for these patients.[4] In

---

[2] Cheetham et al., *The Impact of Stigma on People with Opioid Use Disorder, Opioid Treatment, and Policy*, SUBSTANCE ABUSE & REHAB., Jan. 25, 2022, at 1, 1.
[3] *Id.*
[4] Fong et al., *Medical Provider Stigma Experienced by People who Use Drugs (MPS-PWUD): Development and Validation of a Scale Among People who Currently Inject Drugs in New York City*, DRUG & ALCOHOL DEPENDENCE, Apr. 1, 2021, at 1, 3.

another, nurses reported that they have little motivation for caring for patients with substance use disorders and do not find satisfaction in working with these patients.[5]

36.    Stigma toward people with OUD often results in suboptimal care for people with OUD and is linked to worse patient outcomes.[6]

37.    Stigma extends not only to OUD, but also to the medication used to treat it. Attitudes toward OUD as a choice rather than health condition leads to unwillingness to treat OUD with MOUD—which is the only evidence-based form of treatment for OUD.[7] Stigma toward OUD medications has been found to be a barrier to the delivery of evidence-based treatment.[8]

### B.  MOUD Is Essential OUD Treatment and Must Be Continued in Hospital Settings

38.    Medication used to treat OUD is the only evidence-based treatment for OUD.

39.    There are three FDA approved medications to treat OUD—methadone, buprenorphine, and naltrexone.

40.    Methadone is an agonist treatment, which means it binds to the same brain receptors as all other opioids but does not cause euphoria. Methadone is taken daily and dispensed at an opioid treatment program ("OTP"). Hospitals can also dispense methadone.

41.    Medications are the central component of successful long-term recovery for many

---

[5] *Id.*
[6] Van Boekel et al., *Stigma Among Health Professionals Towards Patients with Substance Use Disorders and its Consequences for Healthcare Delivery: Systematic Review*, 131 DRUG & ALCOHOL DEPENDENCE 23, 33 (Mar. 2013).
[7] *See* Stone et al., *The Role of Stigma in U.S. Primary Care Physicians' Treatment of Opioid Use Disorder*, DRUG & ALCOHOL DEPENDENCE, Apr. 1, 2021, at 1, 3, 8.
[8] *Id.* at 7.

people with OUD.

42.     Repeated use of opioids results in fundamental changes to brain structure and function, particularly the parts of the brain responsible for reward and motivation, decision-making, and stress regulation.[9]

43.     MOUD stabilizes functional changes to the brain caused by OUD and minimizes OUD symptoms, like cravings and withdrawal. MOUD leads to "decreased mortality, abstinence from opioids, and retention in treatment."[10]

44.     MOUD is a life-saving medication. Treatment with methadone results in a fifty percent reduction in mortality.[11]

45.     MOUD treats OUD but does not reverse this chronic disease or the brain changes characteristic of OUD. People who discontinue medications—by choice or by force—often have recurrent OUD symptoms, in addition to withdrawal symptoms if their medication is abruptly stopped or rapidly tapered. Both withdrawal and relapse are serious and potentially fatal medical conditions.

---

[9] *See* National Acads. of Sci., Eng'g, & Med., *Medications for Opioid Use Disorder Saves Lives* 23 (2019), https://www.nap.edu/catalog/25310/medications-for-opioid-use-disorder-save-lives.
[10] Am. Soc'y of Addiction Med. ("ASAM"), *The ASAM National Practice Guideline for the Treatment of Opioid Use Disorder: 2020 Focused Update* 27 (2020), https://www.asam.org/quality-care/clinical-guidelines/national-practice-guideline.
[11] Luis Sordo et al., *Mortality Risk During and After Opioid Substitution Treatment: Systematic Review and Meta-Analysis of Cohort Studies*, BMJ, Apr. 26, 2017, at 1, 7; *accord* Thomas Santo et al., *Association of Opioid Agonist Treatment with All-Cause Mortality and Specific Causes of Death Among People with Opioid Dependence: A Systematic Review and Meta-Analysis*, 78 JAMA PSYCHIATRY 979, 984 (Sept. 2021).

46.     One or two missed doses of methadone can lead to withdrawal symptoms; therefore, continuity of care is crucial. Studies have shown that individuals' mortality rates are three times higher during periods when their methadone treatment is stopped.[12]

47.     There is significant suffering associated with withdrawal. Symptoms of withdrawal include muscle pain, vomiting, diarrhea, depressed mood, insomnia, and anxiety.

48.     All studies exploring tapering or discontinuing medication show high rates of relapse.[13] Forcing people to stop or taper their medications in hospitals puts people at risk of withdrawal, overdose, and death.[14] Additionally, the rate of overdose death within two weeks of hospital discharge is extremely high, with one study finding that they account for 1 in 14 overdose deaths.[15]

49.     The Substance Abuse and Mental Health Services Administration's ("SAMHSA") Treatment Improvement Protocol explains that it is appropriate and essential for MOUD to be continued for patients when they are admitted to hospitals.[16] Experts in the field of addiction have recommended and urged "providers not to force patients to withdraw from opioid agonist treatment in the hospital..."[17] Instead, hospitals should and are able to dispense methadone to

---

[12] Sordo et al., *supra* note 11, at 4.

[13] National Acads. of Sci., Eng'g, & Med., *supra* note 9, at 40.

[14] *See* Substance Abuse and Mental Health Servs. Admin. ("SAMHSA"), *Treatment Improvement Protocol (TIP) 63: Medications for Opioid Use Disorder for Healthcare and Addiction Professionals, Policymakers, Patients, and Families*, at 3-11, 3-92 (2021), https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf.

[15] Lewer et al., *Fatal Opioid Overdoses During and Shortly After Hospital Admissions in England: A Case Crossover Study*, PLOS MEDICINE, Oct. 5, 2021, at 1, 7-8.

[16] SAMHSA, *supra* note 14, at 3-103, 3-105.

[17] *Id*. at 3-108.

patients who have been receiving methadone through an OTP prior to their hospital admission.[18]

50.     Denying MOUD to individuals with OUD, when not indicated as medically necessary, is discriminatory.

**C. Intravenous Antibiotics Administered at Home Via a PICC Line Is a Standard Form of Treatment for Serious Infections**

51.     Intravenous antibiotics are necessary to treat certain serious infections, such as bone infections. Oral antibiotics are not effective at treating all serious infections.

52.     Intravenous antibiotics can be administered outside of the hospital, which is referred to as outpatient parenteral antimicrobial therapy ("OPAT").

53.     OPAT is associated with greater patient satisfaction as it allows a return to normal daily life and responsibilities, increased comfort and privacy, and reduction in risk of acquiring healthcare associated infections.[19]

54.     The majority of OPAT in the United States is home-based.[20]

55.     People taking intravenous antibiotics at home take the antibiotics through a PICC line.

56.     A PICC line is a thin, flexible plastic tube that is typically placed in a large vein in the upper arm. One end of the PICC line is left outside of the body, while the remainder is placed inside the body. An individual with a PICC line delivers medication into their bloodstream through the end that stays outside of their body.

---

[18] *Id.*, at 1-8.
[19] Suzuki et al., *Outpatient Parenteral Antimicrobial Therapy Among People Who Inject Drugs: A Review of the Literature*, OPEN FORUM INFECTION DISEASES, Aug. 7, 2018, at 1, 1.
[20] Norris et al., *supra* note 1, at e15.

57.     The PICC line remains in place through the duration of a treatment course. With a PICC line, a patient does not need a new intravenous line inserted every time antibiotics are administered.

58.     Administration of antibiotics via PICC lines is a safe and effective treatment for serious infections.

59.     Home-based intravenous antibiotic treatment via PICC lines is a standard form of delivery for people who need intravenous antibiotics for days, weeks, or months. As compared to PICC line placement, placing a new intravenous line every day is associated with a greater risk of infection as each placement could lead to infection.

60.     PICC lines can also be used to draw blood for monitoring of infections, decreasing the need for separate antibiotic administration and blood draws.

61.     Home-based antibiotics via PICC lines is a preferred method of administration for prolonged antibiotic courses, as it is least restrictive for the patient, results in increased patient satisfaction, and is a more time and fiscally efficient method of treatment.[21]

62.     The Infectious Diseases Society of America's ("IDSA") guidelines around PICC line insertion include the following considerations before placement: patient preference, stability of home environment, ability to administer antibiotics and care for the PICC line, informed consent by the patient as to the risks and benefits, insurance coverage, travel capabilities, and ongoing communication with health professionals.[22]

---

[21] *See id*. at e15; Suzuki et al., *supra* note 19, at 1.
[22] Tice et al., *Practice Guidelines for Outpatient Parenteral Antimicrobial Therapy*, 38 CLINICAL INFECTIOUS DISEASES 1651, 1653-54 (May 26, 2004).

63.     People with a diagnosed history of SUD, including OUD that involved injection drug use, are eligible for PICC lines.

64.     With regard to PICC line placement decisions, medical literature treats patients with a history of OUD who no longer use illicit substances the same as patients with no such history. There is no distinction between PICC line placement decisions for people who have previously used drugs versus those who have not.[23]

## II.     Defendants' Discriminatory Treatment of Mr. Landau

---

[23] Even the fact that someone currently injects drugs is not alone a sufficient reason to deny patients standard infection management treatment through a PICC line. Research has shown that outcomes do not vary among people who use drugs and start taking buprenorphine when they receive intravenous antibiotics at home via a PICC line versus while under observation in a hospital. Fanucchi et al., *Outpatient Parenteral Antimicrobial Therapy Plus Buprenorphine for Opioid Use Disorder and Severe Injection-Related Infections*, 70 CLINICAL INFECTIOUS DISEASES 1226, 1227-28 (July 18, 2019).  A recent study found that a majority of surveyed infectious diseases clinicians provide OPAT to people who currently inject drugs. Solomon et. al., *Perspectives on the Use of Outpatient Parenteral Antibiotic Therapy for People who Inject Drugs: Results from an Online Survey of Infectious Diseases Clinicians*, OPEN FORUM INFECTIOUS DISEASES, July 2023, at 1, 2. When someone is currently using injection drugs, the IDSA, the American Heart Association ("AHA"), and other healthcare professionals explain that an individual analysis should be used to determine if an individual can go home with a PICC line. Norris et al., *supra* note 1, at e16; Baddour et al., *AHA Scientific Statement: Management of Infective Endocarditis in People who Inject Drugs: A Scientific Statement from the American Heart Association*, 146 CIRCULATION e187, e192 (Aug. 31, 2022); Eaton et al., *A 9-Point Risk Assessment for Patients Who Inject Drugs and Require Intravenous Antibiotics: Focusing Inpatient Resources on Patients at Greatest Risk of Ongoing Drug Use*, 16 CLINICAL INFECTIOUS DISEASES 1041, 1043 (Aug. 2023); Infectious Diseases Soc'y of Am., *Handbook of Outpatient Parenteral Antimicrobial Therapy for Infectious Diseases* 22 (2016), https://www.idsociety.org/opat-ehandbook/. Factors to be considered in such an analysis include: patient preference, whether the patient is engaged in treatment with methadone or buprenorphine, informed consent, and a stable home environment. Baddour et al., *supra*, at e192; *see also* Eaton et al., *supra*, at 1041. The AHA states that it is critical to consult with a medical team consisting of doctors practicing in both infectious disease and addiction. Baddour et al., *supra*, at e192. Studies have identified patients' home environment and treatment with methadone or buprenorphine as key factors in determining whether someone currently injecting drugs can be discharged home with a PICC line. *Id.*

**A. Defendants' August 2020 Denials of Methadone and Home-Based Intravenous Antibiotic Treatment Via a PICC Line**

65.     On August 19, 2020, Mr. Landau was admitted to Good Samaritan Hospital from the emergency department because he needed surgery due to an infection stemming from a diabetic ulcer with bone exposure on his left foot.

66.     During Mr. Landau's stay at the Hospital from August 19 to August 26, 2020, the Hospital refused to administer methadone, even though Mr. Landau's medical records clearly state he was taking methadone upon admission and despite his requests for his medication.

67.     Upon information and belief, as a matter of course, Defendants ensure continuation of appropriate, prescribed medications that patients were taking upon admission. But Defendants did not do so for Mr. Landau because it was addiction medication needed to treat his disability.

68.     Defendants' discriminatory denial of methadone to Mr. Landau directly and proximately caused him to experience withdrawal symptoms including nausea, cold sweats, vomiting, a sensation of skin crawling, anxiousness, restlessness, sleeplessness, feelings of wanting to die, and difficulty eating and sleeping.

69.     Defendants' discriminatory denial of methadone to Mr. Landau directly and proximately caused him to feel extremely frustrated and stigmatized. Mr. Landau was in Good Samaritan Hospital to receive necessary care for his severe infection, but at the same time denied necessary medication to treat his OUD. He felt judged, humiliated, and stigmatized, like he was not worthy of care or having his health condition taken seriously and appropriately treated. Mr. Landau was anxious and worried that he was being set up to fail by not being provided the

14

necessary medication prescribed to keep him in recovery. Mr. Landau was scared of what would happen if he did not take his medication—he knew that it could derail his recovery and that an abrupt cessation of his medication would put him through withdrawal.

70.     Defendants' discriminatory denial of methadone to Mr. Landau directly and proximately denied him the full expected benefit of hospital care from Defendants and the opportunity to continue his recovery and OUD treatment without interruption.

71.     Based on the fear of continued withdrawal and the desire for his OUD to be appropriately treated, Mr. Landau arranged for his partner to bring his take home doses of methadone dispensed from his OTP to the Hospital.[24] Mr. Landau continued to take his take home doses from the OTP during his stay at the Hospital, from approximately August 21 to August 26.

72.     After Mr. Landau's procedure on August 22, 2020, he recovered in the Hospital through August 26, 2020, during which time he was prescribed intravenous antibiotics.

73.     Mr. Landau's medical records note that during his hospital stay from August 22 to August 25, he was using a walker, cane, or other assistive device. His surgeon also noted that Mr. Landau had a "weightbearing precaution to walk only with putting left heel down in orthopedic shoe and crutch."

---

[24] When patients first start attending an OTP, they must go to the OTP every day for their dose of methadone. After a patient progresses in treatment, they get "take home" doses of methadone, where they are given a week to several weeks-worth of medication to take at home, rather than returning to their OTP every day for their medication.

74.     On August 26, 2020, Mr. Landau was set to be discharged. The infectious disease doctor who was attending Mr. Landau in the Hospital, Dr. Mahlet Tadele, ordered a PICC line be placed so that Mr. Landau could continue his course of antibiotics at home.

75.     Dr. Tadele noted in Mr. Landau's medical records, "the patient has a need for long-term intravenous access for antibiotic therapy."

76.     A nurse sent a referral to a home infusion company that would work with Mr. Landau so he could take his antibiotics at home via a PICC line.

77.     Dr. Scott Luchs completed Mr. Landau's PICC line insertion procedure at the Hospital on August 26, 2020.

78.     Good Samaritan Hospital told Mr. Landau that he could be discharged. Mr. Landau called his partner, who came to pick him up from the Hospital. Mr. Landau was waiting on the edge of his bed to sign his discharge papers and be taken outside by the Hospital patient transportation team.

79.     Mr. Landau's medical records reflect that sometime after his PICC line insertion procedure, a question was presented to the care management team, which is primarily comprised of social workers and nurses, about Mr. Landau's history of substance use.

80.     After Mr. Landau had been waiting approximately 20 minutes for his discharge to be completed, a nurse or social worker went into his room and told Mr. Landau that the Hospital would not discharge him because he was not allowed to go home with the PICC line.

81.     When Mr. Landau asked why, the nurse or social worker said it was because of his prior history of injection drug use.

16

82.     Mr. Landau was extremely anxious after finding out that his discharge was cancelled. He had taken his last dose of methadone and was set to go to his OTP the next day, as scheduled, to pick up more take-home doses. Mr. Landau was scared that he would begin to experience withdrawal symptoms again, since the Hospital refused to give him his medication.

83.     Mr. Landau asked to speak to the doctor who made the decision to remove the PICC line. Upon information and belief, Dr. Anuj Kapoor—the doctor working discharge— spoke to Mr. Landau about the PICC line removal.

84.     Dr. Kapoor was not Mr. Landau's attending physician and, upon information and belief, had no familiarity with Mr. Landau's history of OUD and progress in recovery.

85.     Dr. Kapoor told Mr. Landau that it was Hospital policy to deny PICC lines to people with a history of OUD.

86.     Mr. Landau asked why his history of OUD meant the Hospital would not discharge him with a PICC line. Dr. Kapoor remarked that Mr. Landau would just use the PICC line to inject drugs.

87.     Mr. Landau told Dr. Kapoor that he was in recovery and had been taking methadone for eight months through the Lexington Center for Recovery. Mr. Landau requested that the Hospital call the Lexington Center for Recovery to verify his treatment.

88.     However, Dr. Kapoor repeated that Mr. Landau would inject drugs into the PICC line and commented to Mr. Landau something to the effect of, "I won't lose my license because of some junkie."

89.     Mr. Landau said to Dr. Kapoor that denying the PICC line was not fair or right.

90.     A social worker on the care management team also questioned Mr. Landau about his history of substance use. Mr. Landau informed care management that he was in recovery and begged them to call the Lexington Center for Recovery to speak with his addiction doctor or the program director.

91.     A member of the care management team told Mr. Landau that he would consider the PICC line to be easy access to use drugs. Mr. Landau was again shocked that the Hospital would assume that he would use drugs, because he was in recovery and told the Hospital the opposite.

92.     Mr. Landau reported that he had no desire to use drugs and offered to be drug tested by the Hospital. Mr. Landau explained that he had a stable and supportive living environment with his partner. Mr. Landau also explained that he attended daily virtual recovery support meetings.

93.     After the care management team spoke with Mr. Landau, the Director of Case Management, Claudia Williams, reported to Dr. Tadele that the team was concerned about sending Mr. Landau home with a PICC line because of his substance use history.

94.     Dr. Tadele approved removing the PICC line and denying Mr. Landau the opportunity to receive home-based antibiotic treatment.

95.     Claudia Williams and a nurse told Mr. Landau that he could either go to a skilled nursing facility to receive his daily antibiotics or travel every day from his home to an infusion center.

96.     Mr. Landau requested home-based care, explaining again that he was in recovery and stating again that he was treated with methadone through the Lexington Center for Recovery.

97.     The care management records reflect that Claudia Williams and the nurse questioned whether Mr. Landau had actually been taking methadone because it was not on his list of administered medications during his hospital stay.

98.     However, Mr. Landau's medical records clearly state that he was taking methadone upon admission. Mr. Landau's requests for methadone when he was admitted to the Hospital on August 19, 2020, were not fulfilled by the Hospital. Mr. Landau was taking his medication during the majority of his hospital stay because he decided to take his take-home doses administered from the Lexington Center for Recovery, rather than being continuously forced into withdrawal.

99.     Upon information and belief, the care management team never attempted to verify his treatment with the Lexington Center for Recovery.

100.     Upon information and belief, the care management team did not speak with an addiction specialist about whether there were legitimate reasons that standard treatment protocol—intravenous antibiotics administered in a patient's home through a PICC line—should be strayed from for Mr. Landau or patients with a documented history of OUD.

101.     Mr. Landau's discharge summary, authored by Dr. Kapoor, notes that Mr. Landau's PICC line was removed because of his history of substance use.

102.    Bon Secours's Chief Medical Officer, Kenneth Janowski, and Westchester Medical Center Health Network's Senior Vice President and Chief Nurse Executive, Phyllis Yezzo, also agreed to deny Mr. Landau a PICC line and home-based antibiotic treatment.

103.    Defendants removed Mr. Landau's PICC line against his requests and express communication that he was in treatment and recovery, taking methadone, had no intention of using drugs, and had a stable and supportive living environment.

104.    Defendants had no reason to believe that Mr. Landau's representations were not true.

105.    Defendants made no attempts to verify Mr. Landau's representations.

106.    Because August 2020 was during the height of the COVID-19 pandemic and Mr. Landau did not want to contract COVID-19 in a skilled nursing facility, particularly considering that he is immunocompromised, he felt he had no choice but to agree to go to the infusion center daily to receive the remainder of his six-week antibiotic course.

107.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to feel devalued, disposable, and like he did not matter. Mr. Landau did not feel treated like a patient, but a "junkie" whose recovery, serious foot wounds, and infections did not deserve to be taken seriously. Mr. Landau felt helpless because the Hospital's stigma was preventing him from receiving standard treatment for the care and recovery of his foot wounds and infection.

108.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to feel that, because he was a person with OUD, he was seen as unworthy of care and as someone that would not be trusted or believed. He felt deeply hurt, shocked, and discarded

20

because the Hospital refused to believe him when he said that he was taking methadone and in recovery, and refused to take the time to call the Lexington Center for Recovery to verify his treatment. He felt that because he was a person with OUD, all of his health needs would suffer.

109.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him anxiety and fear about being forced into withdrawal again if he was required to stay in the Hospital or go to a skilled nursing facility that might also deny him methadone.

110.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him anxiety over whether he, an immunocompromised individual, would contract COVID-19 if forced to go to a skilled nursing facility.

111.    From approximately August 27 to September 30, 2020, Mr. Landau made approximately 35 trips to the Hospital's infusion center to receive intravenous antibiotics and approximately seven trips to its wound care clinic for wound care.

112.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to be in constant fear that he would contract COVID-19 at the infusion center.

113.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to travel 12 miles each way to the Hospital's infusion center for antibiotic and wound care for approximately 35 days. Mr. Landau shares a car with his partner, and she had to adjust her work schedule to take him to the Hospital for his antibiotics and wound care. Eventually, Mr. Landau had to rent a car to get to his appointments at the infusion center.

114.    Each day, Mr. Landau had to find parking, make his way through the parking lot and then through the infusion center, which placed unnecessary pressure and strain on his injured foot.

21

115.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to experience physical pain each time he travelled to the infusion center and had to put pressure on his left foot.

116.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to fear that something irreversible would happen to his foot if his wound and infection did not heal. Mr. Landau constantly agonized over and contemplated whether his wound be healing faster if he had not been forced to make daily trips to the infusion center and had instead been able to receive his antibiotics at home.

117.    Upon information and belief, traveling to the infusion center approximately 35 times made it more difficult for Mr. Landau's wound to heal, aggravated the condition for which he was seeking treatment, led to an additional wound, and likely hastened the amputation of his foot.

118.    Because Mr. Landau was denied a PICC line, a new intravenous line had to be placed every day at the infusion center, which was challenging because he has difficult intravenous access. It sometimes took multiple attempts to place the intravenous line.

119.    When it took more than three attempts to place the intravenous line, Mr. Landau had to wait for a different nurse to try to place the line. Mr. Landau felt like a pin cushion. His arms were covered in bruises during this time, and he was left with several scars. Each infusion took approximately 30 to 45 minutes.

120.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to feel physical pain and discomfort from the daily placement of a new intravenous line.

22

121.   Defendants' discriminatory treatment of Mr. Landau directly and proximately denied him the full expected benefit of hospital care from Defendants, including his expectation to have his circumstances and care preferences considered and the opportunity to receive the most appropriate and effective antibiotic course in his home.

122.   Since Defendants denied Mr. Landau a PICC line and home-based antibiotic treatment on August 26, 2020, he has received care at Good Samaritan Hospital approximately 96 times.

**B. Defendants' January 2021 Denial of Home-Based Intravenous Antibiotic Treatment Via a PICC Line**

123.   After finishing his course of antibiotics on September 30, 2020, Mr. Landau continued to receive care at Good Samaritan Hospital for ongoing issues related to his diabetic foot ulcer and resulting wounds.

124.   On January 18, 2021, Mr. Landau was admitted to the Hospital based on a referral from his infectious disease doctor, Dr. Foluke Salu. Mr. Landau was admitted for a course of intravenous antibiotics to treat osteomyelitis—inflammation or swelling of the bone—and possible infection.

125.   On January 21, 2021, after receiving part of his intravenous antibiotic course at the Hospital, Defendants again made the decision to deny Mr. Landau a PICC line and the opportunity for home care and determined he would continue his intravenous antibiotic course via the infusion center upon discharge. Mr. Landau's medical records states that the Hospital decided that "PICC line placement was not an option due to his substance abuse history…Pt was adamant to go home."

23

126.    Upon information and belief, the Hospital did not ask Mr. Landau questions about his past substance use, his treatment history, or his home environment, and did not consider his care preferences, contact Mr. Landau's providers at his OTP, or speak with an addiction specialist at the Hospital.

127.    When the Hospital told Mr. Landau he would have to complete his antibiotic course by going to the infusion center every day for the remainder of his treatment, he objected to being given only this limited option.

128.    Mr. Landau did not want to go through the daily burdens of arranging time when his partner could take him to the infusion center, travelling to the infusion center, experiencing physical pain, having an intravenous line placed, and spending 30 to 45 minutes getting infusions for the remainder of his antibiotic course, in addition to having constant fear over the possibility of contracting COVID-19.

129.    Based on Mr. Landau's objection, the Hospital discharged Mr. Landau on January 21, 2021 with a prescription for oral antibiotics, despite its first order for continued intravenous antibiotics.

130.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to, again, feel devalued, disposable, unworthy of care, and judged, instead of treated like a patient with significant health needs that were taken seriously. Mr. Landau felt frustrated and angry that decisions about his health care were continuously being made based on stigma rather than the best type of care for his needs.

131.    Defendants' discriminatory treatment of Mr. Landau directly and proximately caused him to feel stress and anxiety over what could happen to his foot because his prescription

for intravenous antibiotics had been replaced by a prescription for oral antibiotics. Mr. Landau knew that his foot was at risk of amputation and was distressed over having limited treatment options that would make him choose between appropriate antibiotics and placing continued pressure on his foot if he travelled to the infusion center daily.

132.    Defendants' discriminatory treatment of Mr. Landau directly and proximately denied him the full expected benefit of hospital care from Defendants, including his expectation to have his circumstances and care preferences considered and the opportunity to receive the most appropriate and effective antibiotic course in his home.

133.    After being discharged on January 21, 2021, Mr. Landau believed that he was wrongly denied the option of receiving antibiotics at home because of his history of substance use.

134.    Upon information and belief, Mr. Landau spoke with Dr. Salu through her private practice about receiving antibiotics at home through a PICC line.

135.    Mr. Landau also spoke to practitioners at his OTP about the Hospital's denial of a PICC line based on his substance use history. Mr. Landau requested that his OTP speak with Dr. Salu about any concerns she might have about the PICC line placement.

136.    Dr. Salu ordered a PICC line for Mr. Landau, which was placed on February 11, 2021.

137.    Mr. Landau finished his antibiotics intravenously at home via a PICC line without issue.

138.    After January 21, 2021, Mr. Landau received care at the Hospital approximately 44 times.

25

## C. Defendants' August 2021 Denial of Methadone

139.    Unfortunately, after finishing his antibiotic course, Mr. Landau continued to have ongoing issues with his left foot and ankle.

140.    Eventually, Mr. Landau's left leg had to be amputated below the knee.

141.    Mr. Landau returned to Good Samaritan Hospital on August 4, 2021 to have his leg amputated.

142.    After he was admitted to the Hospital on August 4, 2021, the Hospital again denied Mr. Landau methadone to treat his OUD, despite the fact that Mr. Landau's medical records clearly state that he was taking methadone upon admission and despite his requests for his medication.

143.    Upon information and belief, as a matter of course, Defendants ensure continuation of appropriate, prescribed medications that patients were taking upon admission. But Defendants did not do so for Mr. Landau because it was addiction medication needed to treat his disability.

144.    Defendants' discriminatory refusal to provide methadone to Mr. Landau directly and proximately caused him to go into abrupt withdrawal. Mr. Landau experienced serious symptoms of withdrawal including profuse sweating, nausea, fainting, chronic headaches, sleeplessness, restlessness, anxiousness, difficulty eating, and vomiting.

145.    Defendants' discriminatory refusal to provide methadone to Mr. Landau directly and proximately cause him serious anxiety and mental discomfort. Mr. Landau again felt stigmatized and like his health needs were not being taken seriously because he was not being treated appropriately with medication for his OUD.

26

146.     Defendants' discriminatory refusal to provide methadone to Mr. Landau directly and proximately denied him the full expected benefit of hospital care from Defendants and the opportunity to continue his recovery and OUD treatment without interruption.

147.     Since his August 2021 hospital admission, Mr. Landau has continued to receive care from Dr. Sean Wengerter, the vascular surgeon who performed his amputation and the division chief of vascular surgery at the Hospital. Mr. Landau last received care from Dr. Wengerter in January 2023.

## III.     Defendants Intentionally Discriminated Against Mr. Landau

148.     Upon information and belief, Defendants' policies, procedures, and practices do not ensure consistent and appropriate administration of methadone for OUD, which forces patients into medically inappropriate withdrawal, even when they are receiving methadone prior to admission. This policy, procedure, and practice subjected Mr. Landau to discrimination because of his disability.

149.     Defendants' treatment of Mr. Landau constitutes intentional discrimination and deliberate indifference. MOUD is the only evidence-based treatment for OUD. From August 19-26 2020 and August 4-12, 2021, Defendants were aware that Mr. Landau was taking methadone prior to his admissions yet they chose to ignore this information.

150.     Defendants have a policy, procedure, and practice of denying home-based intravenous antibiotic treatment via PICC lines to people with OUD discharged from inpatient solely on the basis of their disability. As a result of this policy, procedure, and practice, Mr. Landau was subjected to discriminatory treatment because of his disability.

27

151.    Mr. Landau's documented history of OUD, from which he was in recovery and no longer using drugs, was not a valid reason to deny him home-based anti-biotic treatment via a PICC line on August 26, 2020 or January 21, 2021.

152.    On August 26, 2020, if Defendants had any legitimate safety concerns, then they should have conducted a complete individual analysis and made the decision based on that analysis. A proper analysis would have fully considered the preference of Mr. Landau to be in his home, the fact that he was taking methadone, the fact that he was in recovery from his OUD and no longer using drugs, the fact that he had a stable home environment, and the recommendations of an addiction specialist, including the recommendations of the providers at Mr. Landau's OTP.

153.    In fact, Defendants knew that Mr. Landau was in recovery, taking methadone, had no stated desire to use drugs, and had a stable home environment, but chose to ignore this information.

154.    Defendants' application of their policy, procedure, or practice of denying home-based intravenous antibiotic care via PICC lines to people with OUD discharged from inpatient care to Mr. Landau, constitutes intentional discrimination and deliberate indifference solely on the basis of disability. Mr. Landau stated his clear preference for a PICC line and home-based care, and Defendants had the information that would alleviate any potential safety concerns, yet Defendants chose to ignore that information.

155.    On January 21, 2021, rather than continuing with the ordered course of intravenous antibiotics or conducting an individualized analysis, when Mr. Landau objected to

Defendants' discriminatory conduct, Defendants changed his treatment plan to care with oral antibiotics, which is less effective than intravenous antibiotics for treating serious infections.

156.    For a second time, Defendants refused to appropriately respond to Mr. Landau's objections to discriminatory and unequal treatment—which would have included completing an individual analysis if they had any legitimate safety concerns. Instead, Defendants only modified their form of unequal treatment and chose to provide Mr. Landau with services they knew were not the first or best option available. This deliberate choice reflects Defendants' intentional discrimination and deliberate indifference toward Mr. Landau.

## FIRST CAUSE OF ACTION
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT

157.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

158.    Title III of the Americans with Disabilities Act ("ADA") provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.

159.    At all times relevant to this action, Mr. Landau has been diagnosed with OUD, a physical and medical impairment that substantially limits his major life activities, including caring for himself, sleeping, concentrating, thinking, communicating, working, and brain and neurological functions, which are major bodily functions. Therefore, Mr. Landau is an individual with a disability within the meaning of the ADA. 42 U.S.C. § 12102.

160.     At all times relevant to this complaint, Mr. Landau has had a record of impairment—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of the ADA. 42 U.S.C. § 12102.

161.     At all times relevant to this action, Mr. Landau has been regarded by Defendants as having a disability—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of the ADA. 42 U.S.C. § 12102.

162.     At all times relevant to this action, Defendants owned, leased, or operated a place of public accommodation within the meaning of the ADA. 42 U.S.C. §§ 12182, 12181(7)(F).

163.     Defendants discriminated against Mr. Landau by withholding and denying him the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of their public accommodation because of his disability, in violation of Title III of the ADA and its implementing regulations. 42 U.S.C. § 12182 and 28 C.F.R. § 36.101 *et seq.*

164.     Defendants' discriminatory treatment of Mr. Landau includes: (1) denial of methadone to treat OUD from August 19-26, 2020, (2) denial of methadone to treat OUD from August 4-12, 2021, (3) denial of home-based antibiotics via a PICC line on August 26, 2020, and 4) denial of home-based antibiotics via a PICC line on January 21, 2021. Each constitutes a separate instance of discrimination on the basis of disability, in violation of Title III of the ADA. 42 U.S.C. § 12182 and 28 C.F.R. § 36.101 *et seq.*

165.     Through its actions, Defendants violated Mr. Landau's rights, including by:

   a.  Failing to afford Mr. Landau the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation, in violation of 42 U.S.C. § 12182(b)(1)(A)(i) and 28 C.F.R. § 36.202(a);

30

b. Failing to afford Mr. Landau the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation equal to that afforded to others, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b);

c. Utilizing standards, criteria, or methods of administration that subjected Mr. Landau to discrimination, in violation of 42 U.S.C. § 12182(b)(1)(D) and 28 C.F.R. § 36.204;

d. Imposing and applying eligibility criteria that screen out or tend to screen out individuals with OUD, including Mr. Landau, in violation of 42 U.S.C. § 12182(b)(2)(A)(i) and 28 C.F.R. § 36.301(a); and

e. Failing to make reasonable modifications in policies, practices, and procedures, including for Mr. Landau, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii) and 28 C.F.R. § 36.302(a).

166.    Defendants' policies, procedures, and practices do not ensure consistent and appropriate administration of methadone for OUD. This inconsistent and inappropriate administration is likely to continue pursuant to these policies, procedures, or practices, and Mr. Landau has already been subject to them on two occasions.

167.    On two occasions, Defendants failed to reasonably modify their policies, practices, and procedures to accommodate Mr. Landau's requests for methadone.

168.    Defendants have a policy, procedure, or practice of denying home-based antibiotics via a PICC line to people with OUD discharged from inpatient. Such denials are

likely to continue pursuant to this policy, procedure, or practice, and Mr. Landau has already

been subject to the policy, procedure, or practice on two occasions.

169.    On two occasions, Defendants failed to reasonably modify their policies,

practices, and procedures to accommodate Mr. Landau's requests for home-based antibiotics via

a PICC line.

170.    Mr. Landau has chronic diabetes for which he is still being treated and is likely to

need long-term antibiotics in the future. Mr. Landau intends to return to Good Samaritan

Hospital as it is close to his home, is the hospital that he prefers to go to, and is the hospital

where he has received continuing care for his chronic health conditions. Since being

discriminated against in August 2020, Mr. Landau has received care at Good Samaritan Hospital

nearly 100 times. Since being discriminated against in August 2021, Mr. Landau has continued

receiving care with Good Samaritan Hospital's division chief of vascular surgery, most recently

in January 2023.

171.    Plaintiff is entitled to declaratory and injunctive relief as a result of Defendants'

discriminatory conduct pursuant to 42 U.S.C. § 12188(a)(1), 28 C.F.R. § 36.501(a), and 28

U.S.C. § 2201(a).

172.    Plaintiff is further entitled to an award of attorneys' fees, costs, and disbursements

pursuant to 42 U.S.C. §§ 12188(a)(1), 12205 and 28 C.F.R. § 36.505.


### SECOND CAUSE OF ACTION
### SECTION 504 OF THE REHABILITATION ACT

173.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

174.     Section 504 of the Rehabilitation Act ("Rehabilitation Act") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

175.     At all times relevant to this action, Mr. Landau has had OUD, an impairment that substantially limits his major life activities including caring for himself, sleeping, concentrating, thinking, communicating, working, and brain and neurological functions, which are major bodily functions. Therefore, Mr. Landau is an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(20)(B).

176.     At all times relevant to this complaint, Mr. Landau has had a record of impairment—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(20)(B).

177.     At all times relevant to this action, Mr. Landau has been regarded by Defendants as having a disability—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(20)(B).

178.     At all times relevant to this action, Mr. Landau has been an "otherwise qualified individual with a disability" because he was qualified to receive the medical services he sought from Defendants. 29 U.S.C. § 794(a).

179.     At all times relevant to this action, Defendants received federal financial assistance, including Medicare and/or Medicaid reimbursements, pursuant to the Rehabilitation Act. 29 U.S.C § 794(b).

180.    At all times relevant to this action, Mr. Landau was a third-party beneficiary to the Contracts between the federal government and Defendants conditioning the grants of federal funds on Defendants' promises not to discriminate solely by reason of disability.

181.    Defendants discriminated against Mr. Landau, solely by reason of disability, by excluding him from participation in their programs or activities, denying him the benefits of their programs or activities, and otherwise subjecting him to discrimination, in violation of the Rehabilitation Act and its implementing regulations. 29 U.S.C. § 794 and 45 C.F.R. § 84.4.

182.    Defendants' discriminatory treatment of Mr. Landau includes: (1) denial of methadone to treat OUD from August 19-26, 2020, (2) denial of methadone to treat OUD from August 4-12, 2021, (3) denial of home-based antibiotics via a PICC line on August 26, 2020, and (4) denial of home-based antibiotics via a PICC line on January 21, 2021. Each constitutes a separate instance of discrimination on the basis of disability, in violation of Section 504 of the Rehabilitation Act and its implementing regulations. 29 U.S.C. § 794 and 45 C.F.R. § 84.4.

183.    Through its actions, Defendants violated Mr. Landau's rights, including by:

    a.  Denying Mr. Landau the opportunity to participate in or benefit from their aids, benefits, or services, in violation of 29 U.S.C. § 794 and 45 C.F.R. § 84.4(b)(1)(i);

    b.  Failing to afford Mr. Landau an aid, benefit, or service equal to that afforded to others, in violation of 29 U.S.C. § 794 and 45 C.F.R. § 84.4(b)(1)(ii);

    c.  Failing to provide Mr. Landau with an aid, benefit, or service as effective as that provided to others, in violation of 29 U.S.C. § 794 and 45 C.F.R. § 84.4(b)(1)(iii);

34

d. Utilizing methods of administration that subjected Mr. Landau to discrimination, in violation of 29 U.S.C. § 794 and 45 C.F.R. § 84.4(b)(4);

e. Otherwise limiting Mr. Landau's enjoyment of the rights, privileges, advantages, and opportunities enjoyed by others, in violation of 29 U.S.C. § 794 and 45 C.F.R. § 84.4(b)(1)(vii); and

f. Failing to make reasonable modifications in policies, practices, and procedures, including for Mr. Landau, in violation of 29 U.S.C § 794.

184. Defendants' policies, procedures, and practices do not ensure consistent and appropriate administration of methadone for OUD. This inconsistent and inappropriate administration is likely to continue pursuant to these policies, procedures, or practices, and Mr. Landau has already been subject to them on two occasions.

185. On two occasions, Defendants failed to reasonably modify their policies, practices, and procedures to accommodate Mr. Landau's requests for methadone.

186. Defendants have a policy, procedure, or practice of denying home-based antibiotics via a PICC line to people with OUD discharged from inpatient. Such denials are likely to continue pursuant to this policy, procedure, or practice, and Mr. Landau has already been subject to the policy, procedure, or practice on two occasions.

187. On two occasions, Defendants failed to reasonably modify their policies, practices, and procedures to accommodate Mr. Landau's requests for home-based antibiotics via a PICC line.

188. Mr. Landau has chronic diabetes for which he is still being treated and is likely to need long-term antibiotics in the future. Mr. Landau intends to return to Good Samaritan

Hospital as it is close to his home, is the hospital that he prefers to go to, and is the hospital where he has received continuing care for his chronic health conditions. Since being discriminated against in August 2020, Mr. Landau has received care at Good Samaritan Hospital nearly 100 times. Since being discriminated against in August 2021, Mr. Landau has continued receiving care with Good Samaritan Hospital's division chief of vascular surgery, most recently in January 2023.

189.    Plaintiff is entitled to declaratory and injunctive relief as a result of Defendants' discriminatory conduct pursuant to 29 U.S.C. § 794a and 28 U.S.C. § 2201(a).

190.    Plaintiff is entitled to compensatory damages for the physical pain and suffering, loss of expectation interest, loss of opportunity, and economic loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged herein, pursuant to the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), and/or common law.

191.    In the alternative to compensatory damages, Plaintiff is entitled to nominal damages in recognition of the injury he suffered as a result of Defendants' discriminatory conduct, pursuant to the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), and/or common law.

192.    Plaintiff is further entitled to an award of attorneys' fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794a(b).

**THIRD CAUSE OF ACTION**
**SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT**

193.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

36

194.    Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557") states, "an individual shall not, on the ground prohibited under . . . [section 504 of the Rehabilitation Act of 1973,] section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . "42 U.S.C. § 18116(a).

195.    At all times relevant to this action, Mr. Landau has had OUD, an impairment that substantially limits his major life activities of including caring for himself, sleeping, concentrating, thinking, communicating, working, and brain and neurological functions, which are major bodily functions. Therefore, Mr. Landau is an individual with a disability within the meaning of Section 1557. 42 U.S.C. § 18116(a).

196.    At all times relevant to this complaint, Mr. Landau has had a record of impairment—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of Section 1557. 42 U.S.C. § 18116(a).

197.    At all times relevant to this action, Mr. Landau has been regarded by Defendants' as having a disability—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of Section 1557. 42 U.S.C. § 18116(a).

198.    At all times relevant to this action, Defendants received federal financial assistance, including Medicare reimbursements, and were principally engaged in the business of providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to Section 1557. 42 U.S.C. § 18116(a).

199.    At all times relevant to this action, Mr. Landau was a third-party beneficiary to the Contracts between the federal government and Defendants conditioning the grant of federal funds on Defendants' promises not to discriminate solely by reason of disability.

200.    Defendants discriminated against Mr. Landau, solely by reason of disability, by excluding him from participation in its health programs and activities, denying him the benefits of its health programs and activities, and subjecting him to discrimination, in violation of Section 1557. 42 U.S.C. § 18116(a).

201.    Defendants' discriminatory treatment of Mr. Landau includes: (1) denial of methadone to treat OUD from August 19-26, 2020, (2) denial of methadone to treat OUD from August 4-12, 2021, (3) denial of home-based antibiotics via a PICC line on August 26, 2020, and (4) denial of home-based antibiotics via a PICC line on January 21, 2021. Each constitutes a separate instance of discrimination on the basis of disability, in violation of Section 1557. 42 U.S.C. § 18116(a).

202.    Defendants' policies, procedures, and practices do not ensure consistent and appropriate administration of methadone for OUD. This inconsistent and inappropriate administration is likely to continue pursuant to these policies, procedures, or practices, and Mr. Landau has already been subject to them on two occasions.

203.    On two occasions, Defendants failed to reasonably modify their policies, practices, and procedures to accommodate Mr. Landau's requests for methadone.

204.    Defendants have a policy, procedure, or practice of denying PICC lines and home-based antibiotic treatment to people with OUD discharged from inpatient. Such denials are

likely to continue pursuant to this policy, procedure, or practice, and Mr. Landau has already been subject to the policy, procedure, or practice on two occasions.

205.    On two occasions, Defendants failed to reasonably modify their policies, practices, and procedures to accommodate Mr. Landau's requests for home-based antibiotics via a PICC line.

206.    Mr. Landau has chronic diabetes for which he is still being treated and is likely to need long-term antibiotics in the future. Mr. Landau intends to return to Good Samaritan Hospital as it is close to his home, is the hospital that he prefers to go to, and is the hospital where he has received continuing care for his chronic health conditions. Since being discriminated against in August 2020, Mr. Landau has received care at Good Samaritan Hospital nearly 100 times. Since being discriminated against in August 2021, Mr. Landau has continued receiving care with Good Samaritan Hospital's division chief of vascular surgery, most recently in January 2023.

207.    Plaintiff is entitled to declaratory and injunctive relief as a result of Defendants' discriminatory conduct, pursuant to Section 1557. 42 U.S.C. § 18116(a) and 28 U.S.C. § 2201(a).

208.    Plaintiff is entitled to compensatory damages for the physical pain and suffering, loss of expectation interest, loss of opportunity, and economic loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged herein, pursuant to Section 1557. 42 U.S.C. § 18116(a) and/or common law.

209.     In the alternative, Plaintiff is entitled to nominal damages in recognition of the injury he suffered as a result of Defendants' discriminatory conduct, pursuant to Section 1557. 42 U.S.C. § 18116(a) and/or common law.

210.     Plaintiff is further entitled to an award of attorneys' fees, costs, and disbursements pursuant to Section 1557, 42 U.S.C. § 18116(a).

### FOURTH CAUSE OF ACTION
### NEW YORK STATE HUMAN RIGHTS LAW

211.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

212.     The New York State Human Rights Law (NYSHRL) prohibits as unlawful discrimination, "any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of . . . disability . . . directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . . . . to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of . . . disability . . . or that the patronage or custom threat of any person of or purporting to . . . having a disability is unwelcome, objectionable or not acceptable, desired or solicited." N.Y. Exec. Law § 296(2)(a).

213.     At all times relevant to this action, Mr. Landau has been diagnosed with OUD, a physical, mental, and medical impairment that prevents the exercise of normal bodily brain and neurological functions and is demonstrable by medically accepted clinical techniques. Therefore,

Mr. Landau is an individual with a disability within the meaning of the NYSHRL. N.Y. Exec. Law § 292(21).

214.     At all times relevant to this complaint, Mr. Landau has had a record of impairment—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of the NYSHRL. N.Y. Exec. Law § 292(21).

215.     At all times relevant to this action, Mr. Landau has been regarded by Defendants as having a disability—OUD. Therefore, Mr. Landau is an individual with a disability within the meaning of the NYSHRL. N.Y. Exec. Law § 292(21).

216.     At all times relevant to this action, Defendants were the owners, lessees, proprietors, managers, superintendents, agents, or employees of a place of public accommodation. Therefore, Defendants are places of public accommodation within the meaning of the NYSHRL. N.Y. Exec. Law § 292(9).

217.     Defendants discriminated against Mr. Landau by withholding and denying him the accommodations, advantages, facilities, or privileges of their place of public accommodation because of his disability, in violation of the NYSHRL. N.Y. Exec. Law § 296(2)(a).

218.     Defendants' discriminatory treatment of Mr. Landau includes: (1) denial of methadone to treat OUD from August 19-26, 2020, (2) denial of methadone to treat OUD from August 4-12, 2021, (3) denial of home-based antibiotics via a PICC line on August 26, 2020, and (4) denial of home-based antibiotics via a PICC line on January 21, 2021. Each constitutes a separate instance of discrimination on the basis of disability, in violation of the NYSHRL. N.Y. Exec. Law § 296(2)(a).

219.    Defendants' policies, procedures, and practices do not ensure consistent and appropriate administration of methadone for OUD. This inconsistent and inappropriate administration is likely to continue pursuant to these policies, procedures, or practices, and Mr. Landau has already been subject to them on two occasions.

220.    On two occasions, Defendants failed to reasonably modify their policies, practices, and procedures to accommodate Mr. Landau's requests for methadone.

221.    Defendants have a policy, procedure, or practice of denying PICC lines and home-based antibiotic treatment to people with OUD discharged from inpatient. Such denials are likely to continue pursuant to this policy, procedure, or practice, and Mr. Landau has already been subject to the policy, procedure, or practice on two occasions.

222.    On two occasions, Defendants failed to reasonably modify their policies, practices, and procedures to accommodate Mr. Landau's requests for home-based antibiotics via a PICC line.

223.    Mr. Landau has chronic diabetes for which he is still being treated and is likely to need long-term antibiotics in the future. Mr. Landau intends to return to Good Samaritan Hospital as it is close to his home, is the hospital that he prefers to go to, and is the hospital where he has received continuing care for his chronic health conditions. Since being discriminated against in August 2020, Mr. Landau has received care at Good Samaritan Hospital nearly 100 times. Since being discriminated against in August 2021, Mr. Landau has continued receiving care with Good Samaritan Hospital's division chief of vascular surgery, most recently in January 2023.

224.     Plaintiff is entitled to declaratory and injunctive relief as a result of Defendants' discriminatory conduct, pursuant to N.Y. Exec. Law § 297(9) and 28 U.S.C. § 2201(a).

225.     Plaintiff is entitled to compensatory damages for his physical pain and suffering and for the mental anguish and humiliation sustained as a result of Defendants' discriminatory conduct, pursuant to N.Y. Exec. Law § 297(9).

226.     Plaintiff is further entitled to an award of attorneys' fees, costs, and disbursements pursuant to N.Y. Exec. Law § 297(10).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

1.    Enter declaratory judgments stating that:

    a.   Defendants' policies, procedures, or practices that fail to ensure consistent and appropriate administration of methadone for OUD to people in their care unlawfully discriminated against Plaintiff in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, Section 1557 of the Patient Protection and Affordable Care Act, and the New York State Human Rights Law;

    b.   Defendants' failure to reasonably modify their policies, procedures, or practices that do not ensure consistent and appropriate administration of methadone for OUD to people in their care constitutes unlawful discrimination against Plaintiff in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, Section 1557

of the Patient Protection and Affordable Care Act, and the New York State Human Rights Law;

c. Defendants' policy, procedure, or practice of denying home-based antibiotics via a PICC line to patients discharged from inpatient with OUD unlawfully discriminated against Plaintiff in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, Section 1557 of the Patient Protection and Affordable Care Act, and the New York State Human Rights Law; and

d. Defendants' failure to reasonably modify their policy, procedure, or practice of denying home-based antibiotics via a PICC line to patients discharged from inpatient with a documented history of OUD constitutes unlawful discrimination against Plaintiff in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, Section 1557 of the Patient Protection and Affordable Care Act, and the New York State Human Rights Law.

2. Issue an injunction pursuant to Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, Section 1557 of the Patient Protection and Affordable Care Act, and the New York State Human Rights Law:

a. forbidding Defendants from implementing policies, procedures, or practices that deny people with OUD meaningful access to and full and equal enjoyment of services; and

44

  b. ordering Defendants to develop, implement, promulgate, and comply with policies prohibiting future discrimination against Plaintiff and other people with OUD.

3. Award to Plaintiff:

  a. Compensatory damages to the extent allowed by law, including but not limited to economic and expectation damages, lost opportunity, and physical pain and suffering, pursuant to Section 504 of the Rehabilitation Act of 1973 and Section 1557 of the Patient Protection and Affordable Care Act;

  b. In the alternative, nominal damages pursuant to Section 504 of the Rehabilitation Act of 1973 and Section 1557 of the Patient Protection and Affordable Care Act, if compensatory damages are not awarded thereunder;

  c. Compensatory damages to the extent allowed by law, including but not limited to emotional distress damages and physical pain and suffering, under the New York State Human Rights Law;

  d. Reasonable costs and attorneys' fees pursuant to Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, Section 1557 of the Patient Protection and Affordable Care Act, and the New York State Human Rights Law; and

  e. Any and all other relief that this Court finds necessary and appropriate.

## **JURY DEMAND**

Plaintiff demands trial by jury for all the issues a jury properly may decide, and for all the requested relief that a jury may award.

Dated:  August 15, 2023
        New York, New York

Respectfully submitted,

**LEGAL ACTION CENTER**

By:   */s/ Rebekah Joab*
      Rebekah Joab
      Diane Johnston
      Jennifer Sinton

225 Varick St., 4th Floor
New York, New York 10014
Tel: (212) 243-1313
Email: rjoab@lac.org
Email: djohnston@lac.org
Email: jsinton@lac.org

*Counsel for Plaintiff*