SOUTHERN DISTRICT OF NEW YORK
UNITED STATES DISTRICT COURT
―――――――――――――――――――――――x

SHAWN LANDAU,

                Plaintiff,

  - against -

GOOD SAMARITAN HOSPITAL, BON SECOURS CHARITY HEALTH SYSTEM INC., and WESTCHESTER COUNTY HEALTH CARE CORPORATION d/b/a WESTCHESTER MEDICAL CENTER HEALTH NETWORK,

                Defendants.

―――――――――――――――――――――――x

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Index No. 7:23-cv-07227-NSR

*For the Defendants:*

Larry D. Bloomstein (0603)
Aaronson Rappaport Feinstein & Deutsch, LLP
600 Third Avenue
New York, NY 10016
(212) 593-8059
Ldbloomstein@arfdlaw.com

While plaintiff's opposition attempts to camouflage the true essence of the claims by cloaking them under the label of "disability discrimination," plaintiff fails to overcome the stubborn fact that the decision to discharge plaintiff without a PICC line on two isolated occasions or the alleged decision not to prescribe methadone, despite it being prescribed by the same providers on a myriad of other occasions, were medical decisions made in the best interests of a patient with a longstanding and complicated medical history. Indeed, plaintiff attempts to latch onto his disability as a person recovering from opioid use disorder ("OUD") to grant him *carte blanche* to argue that any medical decision made during the extensive, lifesaving and persistent medical care provided by the defendants can always be second-guessed and then attacked as "discriminatory" simply because such decisions involved a patient who also happened to possess a disability.

Although plaintiff's First Amended Complaint focuses on selected encounters, plaintiff sought and received several years of ongoing medical care – both before and after these cherry-picked events -- for a myriad of medical or problems. Admittedly, the motion is limited to the allegations within the complaint, it is worth noting that plaintiff's medical encounters with Good Samaritan (and other medical providers) are much more extensive than those hand-selected by plaintiff for inclusion within the complaint.

Plaintiff, within his opposition, contends this is not a case about medical decision-making, but rather a case arising from claimed discrimination -- albeit by the same doctors, nurses and other provides who apparently provided "non-discriminatory" care 99% of the remaining time -- plaintiff curiously cites to infectious disease guidelines and literature regarding PICC line use within the First Amended Complaint (Exhibit "B" at ¶ 51-64). Therein, plaintiff cites to the risks and benefits of PICC line usage, the indications for placement, etc. Indeed, plaintiff also refers to

medical articles, studies and within Footnote 23 of his brief, and offers the following quote from that source: "When someone is currently using injection drugs, the IDSA, the American Heart Association ("AHA"), and other healthcare professionals explain that an individual analysis should be used to determine if an individual can go home with a PICC line."

The essence of that quote serves to defeat plaintiff's argument that the decision not to provide plaintiff with a PICC line must be tantamount to a discriminatory practice. To the contrary, the authorities that plaintiff cites confirm that several factors play a role in the decision whether to discharge any patient, including one with a history of OUD, with a PICC line. The reference that plaintiff quotes, by its very language, clearly contemplates that some patients who are drug users may not receive a PICC based upon the "individual analysis" performed by the medical provider. In simple terms, the decision not to provide a PICC cannot be reflexively labelled "discrimination" when a variety of medical reasons are necessarily factored into that decision, a point made evident by sources employed by plaintiff to oppose the motion.

A similar analysis holds true for the administration of methadone during the hospital stays. Whether to give the medication, when, how much, and in what form are all medical decisions that are based upon a variety of factors arising from the patient's medical history, clinical condition, lab results, etc. Permitting plaintiff to claim discrimination each time he disagrees with, questions, or doubts a medical decision offered by one of his providers will do nothing more than tie the hands of the physicians and permit plaintiff to chart the course of his treatment plan for fear that a decision that a patient takes issue with will be actionable as discrimination. There is no doubt that plaintiff received the medical treatment he sought and required. In fact, plaintiff concedes that he was admitted to the hospital on several occasions for treatment of a serious, underling condition related to uncontrolled diabetes of a longstanding nature. What is being questioned –once all the layers of plaintiff's legal argument are peeled away -- is the method and mode in which that treatment was delivered, which are

ultimately questions for medical experts.

It cannot be stressed enough that medical providers must be given the latitude to treat patients, including those that have a history or drug abuse or any other claimed disability, without having to fear that any of the many decisions made during the course of medical diagnosis and treatment will later be questioned and attacked for being "discriminatory." However, that is precisely the environment that will ensue if decisions such as this are later placed under the microscope simply because a patient happens to possess a disability and later questions the motives of his or her providers.

The Second Circuit in *McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d. Cir. 2014) crystalized the issues at hand when analyzing a discrimination claim under Section 504 of the Rehabilitation Act. That Court stated:

> The term "discrimination" is potentially confusing in the context of medical treatment. The word has two very different significations — one positive, the other pejorative. In its positive sense, one discriminates by drawing distinctions that are relevant to the qualities or characteristics of the thing observed. In its negative or pejorative sense, one discriminates by withholding advantages or inflicting disadvantages on the basis of irrelevant criteria, under the influence of irrational bias. A doctor who administers a medical treatment to a patient (or withholds it) because the doctor's medical training leads her to conclude that the treatment is medically appropriate (or inappropriate) is practicing the benign form of discrimination. This is true even if the doctor's medical understanding is flawed and her knowledge is deficient. On the other hand, a doctor who inflicts or withholds a type of medical treatment for reasons having no relevance to medical appropriateness — reasons dictated by bias rather than medical knowledge — is practicing the pejorative form of discrimination. It is clear that the intention of the Rehabilitation Act in prohibiting discrimination is to prohibit the pejorative, and not the benign, form. Thus a doctor may refuse to prescribe a particular treatment, which the disabled patient has requested, because of the doctor's assessment (based on an appraisal of the patient's medical condition) that the treatment would be harmful. The doctor's refusal is not discrimination in violation of the statute, even if the doctor's medical analysis is flawed. Such a decision may be malpractice, but it is not discrimination. Section 504 does not authorize a claim for malpractice.

752 F.3d at (footnote and citations omitted).

By plaintiff's own admission within the First Amended Complaint, the decision to order a PICC line in any patient, including those with a known disability, is the result of various factors that a medical provider must consider. Likewise, decisions surrounding the prescription of medication are similarly the product of competing factors that inherently involve a risk/benefit analysis, with the ultimate goal being the best treatment for the patient. Making the wrong decision or making a different decision than the patient may expect or desire is not "pejorative" discrimination. Rather, it falls under the "benign" form of discrimination. As such, plaintiff's attempt to conflate a garden variety medical malpractice claim with purported "pejorative" discrimination does not pass muster and fails to support any of the causes of action within the First Amended Complaint. For these reasons, dismissal is warranted.

Dated:   New York, New York
         March 6, 2024

Yours, etc.

*Larry D. Bloomstein*
BY: Larry D. Bloomstein (0603)
AARONSON RAPPAPORT FEINSTEIN & DEUTSCH, LLP
Attorneys for Defendants
GOOD SAMARITAN HOSPITAL, BON SECOURS CHARITY HEALTH SYSTEM INC., and WESTCHESTER COUNTY HEALTH CARE CORPORATION d/b/a WESTCHESTER MEDICAL CENTER HEALTH NETWORK
Office & P.O. Address
600 Third Avenue
New York, NY 10016
(212) 593-8059
Email: ldbloomstein@arfdlaw.com

-6-

TO:    *Via NYSCEF*
      LEGAL ACTION CENTER
      Attorneys for Plaintiff
      225 Varick St., 4th Floor
      New York, New York 10014
      Tel: (212) 243-1313
      Email: rjoab@lac.org

      EISENBERG & BAUM, LLP.
      Attorneys for Plaintiff
      24 Union Square East, PH
      New York, New York 10003
      (212) 353-8700
      Email: DHommel@eandblaw.com