USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/31/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAWN LANDAU,

                              Plaintiff,

            -against-

GOOD SAMARITAN HOSPITAL, BON
SECOURS CHARITY HEALTH SYSTEM
INC., and WESTCHESTER COUNTY
HEALTH CARE CORP. d/b/a
WESTCHESTER MEDICAL CENTER
HEALTH NETWORK,

                              Defendants.

23-CV-07227 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff Shawn Landau ("Plaintiff" or "Landau") brings this action against several medical

providers—(1) Good Samaritan Hospital ("Good Samaritan" or the "Hospital"); (2) Bon Secours

Charity Health System Inc. ("Bon Secours"); and (3) Westchester County Health Care Corporation

d/b/a Westchester Medical Center Health Network ("WCHCC") (together, "Defendants")—

alleging various claims of discrimination on the basis of his disability. (*See generally* Am. Compl.,

ECF No. 22.) Specifically, Plaintiff alleges violations of: (1) Title II of the Americans with

Disabilities Act (the "ADA"); (2) Title III of the ADA; (3) Section 504 of the Rehabilitation Act

of 1973 (the "RA" or "Section 504"); (4) Section 1557 of the Patient Protection and Affordable

Care Act (the "ACA" or "Section 1557"); and (5) the New York State Human Rights Law (the

"NYSHRL"). (*Id.* ¶ 7.) Defendants moved to dismiss Plaintiff's complaint pursuant to Fed. R. Civ.

P. 12(b)(6). For the following reasons, Defendants' motion is GRANTED in part and DENIED in

part.

1

**FACTUAL BACKROUND**

Plaintiff has been in recovery from Opioid Use Disorder ("OUD"), a chronic brain disease, since March 2019. (*Id*. ¶¶ 19–20.) Plaintiff receives methadone to treat his OUD through his opioid treatment program ("OTP") at the Lexington Center for Recovery.[1] (*Id*. ¶¶ 20–21.) Plaintiff also suffers from diabetes, which he manages with insulin, and treats its complications with antibiotics. (*Id*. ¶¶ 19, 22-23.) Plaintiff has received regular treatment for his conditions from Good Samaritan Hospital, his hospital of choice, since 2017. (*Id*. ¶ 26.) At all relevant times, Plaintiff has had a record of a disability within the meaning of federal and state anti-discrimination laws—OUD—and was regarded by Defendants as having a disability. (*Id*. ¶ 9.)

Defendant Good Samaritan is a not-for-profit hospital in Suffern, New York. (*Id*. ¶ 10.) Defendant Bon Secours is a not-for-profit healthcare provider that owns and operates Good Samaritan. (*Id*. ¶ 11.) Defendant WCHCC is a public benefit corporation and healthcare system that is the majority owner of Bon Secours. (*Id*. ¶ 12.) All Defendants receive federal financial assistance in some capacity. (*See id*. ¶¶ 13–16.)

Plaintiff identifies four incidents in which Defendants allegedly discriminated against him on the basis of his OUD, each of which is discussed in turn below.

1. **August 2020 Denial of Methadone Treatment**

Plaintiff was admitted to Good Samaritan from August 19, 2020 through August 26, 2020 because he needed surgery due to an infection stemming from a diabetic ulcer on his left foot. (*Id*. ¶¶ 65-66.) During this stay, Good Samaritan refused to provide Plaintiff methadone despite his medical records reflecting that he was taking methadone upon admission and Plaintiff's requests for the medication. (*Id*.)

---

[1] Methadone is one of three FDA-approved medications used to treat OUD. (Am. Compl. ¶ 39.) Missed doses of methadone can cause patients to suffer from withdrawal symptoms. (*Id*. ¶ 46.)

Plaintiff experienced withdrawal symptoms after being denied methadone and felt "judged, humiliated, and stigmatized." (*Id*. ¶¶ 68-69.) Plaintiff eventually arranged for his partner to bring him his "take home" doses of methadone.[2] (*Id*. ¶ 71.) Plaintiff took the home doses from approximately August 21 to August 26. (*Id*.)

Plaintiff alleges that Defendants' denial of methadone was discriminatory and "directly and proximately denied him the full expected benefit of hospital care from Defendants and the opportunity to continue his recovery and OUD treatment without interruption." (*Id*. ¶ 70.)

### 2. August 2020 Denial of Home-Based Intravenous Antibiotic Treatment via a Peripherally Inserted Central Catheter ("PICC") Line

When Plaintiff was set to be discharged on August 26, 2020, Plaintiff's attending physician, Dr. Mahlet Tadele, ordered that Plaintiff be discharged with a PICC line so that he could continue his antibiotic treatment at home.[3] (*Id*. ¶ 74.) Before Plaintiff could sign the discharge papers, a hospital staff member informed him that he was not allowed to go home with the PICC line "because of his prior history of injection drug use." (*Id*. ¶¶ 79–81.)

Plaintiff asked to speak to the doctor who made the decision to remove the PICC line. (*Id*. ¶ 83.) Plaintiff eventually spoke to Dr. Anuj Kapoor, the doctor working discharge at the time, who informed Plaintiff that it was hospital policy to deny PICC lines to patients with a history of OUD. (*Id*. ¶¶ 83, 85.) When Plaintiff asked why his history of OUD meant that the Hospital would not discharge him with a PICC line, Dr. Kapoor remarked that Plaintiff "would just use the PICC line to inject drugs." (*Id*. ¶ 86.) Plaintiff explained that he was in recovery from his past substance

---

[2] "When patients first start attending an OTP, they must go to the OTP every day for their dose of methadone. After a patient progresses in treatment, they get 'take home' doses of methadone, where they are given a week to several weeks-worth of medication to take at home, rather than returning to their OTP every day for their medication." (*Id*. at 15 n.24.)

[3] PICC lines are a form of home-based intravenous antibiotic treatment that prevents the patient from having to make trips to an infusion center to receive intravenous antibiotics and from needing a new intravenous line inserted every time antibiotics are administered. (*Id*. ¶¶ 57-60.)

3

abuse and had been receiving methadone treatment for eight months through the Lexington Center for Recovery. (*Id*. ¶ 87.) Dr. Kapoor insisted that Plaintiff would inject himself drugs through the PICC line and said something to the effect of "I won't lose my license because of some junkie." (*Id*. ¶ 88.)

After discussions with other hospital officials, Dr. Tadele approved removing Plaintiff's PICC line. (*Id*. ¶¶ 93–94.) Plaintiff's discharge summary, authored by Dr. Kapoor, noted that Plaintiff's PICC line was removed because of his substance abuse history. (*Id*. ¶ 101.) Hospital staff never attempted to verify Plaintiff's OTP treatment and failed to speak with an addiction specialist about whether there were legitimate reasons to deny Plaintiff a PICC line. (*Id*. ¶¶ 99–100.) Kenneth Janowski, Bon Secour's Chief Medical Officer, and Phyllis Yezzo, WCHCC's Senior Vice President and Chief Nurse Executive, also agreed to deny Plaintiff access to a PICC line. (*Id*. ¶ 102.)

Hospital staff informed Plaintiff he could travel daily to a nursing facility or an infusion center to receive his daily antibiotics. (*Id*. ¶ 95.) Plaintiff feared contracting COVID-19 in the nursing facility, so agreed to go to the Hospital's infusion center. (*Id*. ¶ 106.) Plaintiff received treatment at the infusion center from August 27 to September 30, during which time Plaintiff made approximately 35 trips to the infusion center for his antibiotics. (*Id*. ¶ 111.)

3. **January 2021 Denial of Home-Based Intravenous Antibiotic Treatment via a PICC line**

On January 18, 2021, Plaintiff was admitted to Good Samaritan after a referral from his infectious disease specialist, Dr. Foluke Salu, for treatment of inflammation or swelling of the bone and possible infection. (*Id*. ¶ 124.) At the time of discharge, on January 21, the Hospital staff again denied Plaintiff a PICC line and the opportunity for home-based intravenous antibiotic

4

treatment. (*Id.* ¶ 125.) According to Plaintiff's medical records, Good Samaritan decided that "PICC line placement was not an option due to [Plaintiff's] substance abuse history." (*Id.*) The Hospital determined Plaintiff would continue his treatment via the infusion center upon discharge. (*Id.*) Plaintiff objected to being treated at the infusion center, so the Hospital discharged him with a prescription for oral antibiotics. (*Id.* at ¶ 129.) Good Samaritan failed to ask Plaintiff about his past substance abuse, treatment history, home environment, or care preferences and to contact Plaintiff's providers at his OTP or speak with an addiction specialist at the Hospital. (*Id.* ¶ 126.)

After being discharged, Plaintiff spoke to Dr. Salu through her private practice about receiving antibiotics at home through a PICC line. (*Id.* ¶ 134.) Plaintiff also spoke to practitioners at his OTP about the Hospital's denial of a PICC line based on his substance use history and requested that his OTP speak with Dr. Salu. (*Id.* ¶ 135.) On February 11, 2021, Dr. Salu ordered Plaintiff a PICC line. (*Id.* ¶ 136.) Plaintiff finished his antibiotic treatment at home via a PICC line without incident. (*Id.* ¶ 137.)

### 4. August 2021 Denial of Methadone Treatment

After finishing his antibiotic course, Plaintiff continued to experience issues with his left foot and ankle and ultimately had to have his left leg amputated. (*Id.* ¶¶ 139–40.) Plaintiff returned to Good Samaritan on August 4, 2021 for the amputation. (*Id.* ¶ 141.)

During this stay, the Hospital again denied Plaintiff methadone despite his requests and medical records stating that he was taking methadone upon admission. (*Id.* ¶ 142.) This caused Plaintiff to experience withdrawal symptoms. (*Id.* ¶ 144.)

### PROCEDURAL HISTORY

Plaintiff commenced the instant action by filing his initial complaint on August 15, 2023. (ECF No. 1.) On October 11, 2023, Plaintiff filed an amended complaint. (*See* Am. Compl.)

Defendants moved to dismiss Plaintiff's amended complaint under Fed. R. Civ. P. 12(b)(6) and filed a memorandum of law in support of their motion and a reply in further support thereof. (*See* Def. Mem. of L., ECF No. 32; Def. Reply, ECF No. 34.) Plaintiff filed an opposition to Defendants' motion to dismiss. (*See* Pl. Opp., ECF No. 33.)

## LEGAL STANDARD

### A. Fed. R. Civ. P. 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. (quoting *Twombly*, 550 U.S. at 556–57).

When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements", or "[t]hreadbare recitals of the elements of a cause of action." *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## DISCUSSION

Plaintiff alleges disability discrimination under Title II and Title III of the ADA and under the RA, the ACA, and the NYSHRL. Title II and Title III of the ADA, the RA, the ACA, and the

NYSHRL impose nearly identical requirements. Courts in the Second Circuit routinely analyze ADA, RA, ACA, and NYSHRL claims coextensively unless a distinction between the statutes is relevant. *See Henrietta D. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (analyzing Title II and Section 504 claims coextensively); *Vega-Ruiz v. Montefiore Med. Ctr.*, No. 17-CV-1804-LTS-SDA, 2019 WL 3080906, at *2-3 (S.D.N.Y. July 15, 2019) (analyzing ACA, RA, and NYSHRL claims coextensively); *Harty v. Spring Valley Marketplace LLC*, No. 15-CV-8190 (NSR), 2017 WL 108062, at *6 (S.D.N.Y. Jan. 9, 2017) (analyzing Title III and NYSHRL claims coextensively). The differences among the statutes are not applicable to the present case; thus, this Court will analyze Plaintiff's claims coextensively.

To state a claim for violations of Titles II and III of the ADA, the RA, the ACA, and the NYSHRL, a plaintiff must allege that (1) they are a qualified individual with a disability, (2) defendants are subject to the acts, and (3) defendants denied plaintiff the benefits of its services, the full and equal enjoyment of its services, or otherwise discriminated against them because of their disability. *See Henrietta D.*, 331 F.3d at 272; *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008); *Fantasia v. Montefiore New Rochelle*, No. 19 CV 11054 (VB), 2022 WL 294078, at *5 (S.D.N.Y. Feb. 1, 2022). A plaintiff has a viable claim when their disability is "'. . . unrelated to, and thus improper to the consideration of, the services in question.'" *McGugan v. Aldana-Bernier*, 752 F.3d 224, 232 (2d Cir. 2014) (quoting *U.S. v. Univ. Hosp.*, 729 F.2d 144, 156 (2d Cir. 1984))[4]. A plaintiff can base their claim "on any of three theories of liability: disparate treatment

---

[4] *McGugan* involved only Section 504 of the RA. *See* 752 F.3d 224, 229. Nonetheless, Second Circuit courts have since applied the court's reasoning in *McGugan* to claims under Title II and Title III of the ADA. *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 953–54 (2d Cir. 2024) (applying *McGugan* to Title III claims); *Smith v. City of New York*, No. 15-CV-4493, 2016 WL 4574924, at *7 (S.D.N.Y. Sept. 1, 2016) (applying *McGugan* to Title II claims). Because Courts in the Second Circuit routinely analyze ADA, RA, ACA, and NYSHRL claims coextensively, *McGugan* extends to ACA and NYSHRL discrimination claims where, as here, all claims share the same factual basis. *See Vega-Ruiz*, 2019 WL 3080906, at *3 n.3 ("[B]ecause Section 1557 explicitly incorporates Section 504 of the Rehabilitation Act, the Court need not conduct an independent analysis of Plaintiff's ACA claim.") (citations omitted); *Harty v. Spring Valley Marketplace LLC*, 2017 WL 108062, at *6 ("Indeed, the Second Circuit has observed that a disability-

(intentional discrimination), disparate impact, or failure to make a reasonable accommodation."[5] *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021) (citations omitted).

Here, Plaintiff's claims all share the same factual basis. Plaintiff alleges Defendants discriminated against him when they denied him: (1) methadone during his August 2020 and August 2021 hospitalizations, and (2) home-based intravenous antibiotic treatment via a PICC line on August 26, 2020 and January 21, 2021. (Am. Compl. ¶¶ 65–147.) As a preliminary matter, the Parties agree that Plaintiff is a qualified individual with a disability and that Defendants are subject to the RA, the ADA, the ACA, and the NYSHRL; however, Defendants argue that Plaintiff was not denied the benefits of their services, the full and equal enjoyment of their services, or otherwise discriminated against Plaintiff because of his disability. The Court will address Plaintiff's alleged discriminatory treatment denials in turn.

### A. Methadone Treatment Denials

Plaintiff fails to sufficiently plead that Defendants discriminated against him on the basis of his disability when they denied him methadone treatment during his August 2020 and August 2021 hospitalizations. In his opposition, Plaintiff characterizes Defendants' refusal to administer methadone as both disparate treatment and a failure to accommodate his disability. (Pl. Opp. at 7–11.) With respect to disparate treatment, Plaintiff further contends that: (1) Defendants' refusal to administer methadone denied him health services because of his disability; (2) Defendants acted with his disability in mind or with animus toward individuals with his condition; and (3) Defendants treated him less favorably than others because of his disability. (*Id.*)

discrimination claim under the NYSHRL 'survives or fails on the same basis as [the parallel] ADA claim.'") (citations omitted).

[5] While *Hamilton* concerned only the ADA, as discussed in footnote 3, the court's analysis applies coextensively here to Plaintiff's RA, ACA, and NYSHRL claims as well.

These assertions, however, are wholly conclusory and unsupported by factual allegations. (*See, e.g.*, Am. Compl. ¶¶ 68–70, 144–146.) Plaintiff does not plead facts that would allow the Court to reasonably infer that Defendants denied him access to medical services because of his disability. For example, Plaintiff does not allege that Defendants refused to treat him altogether, delayed necessary care, or provided substandard care because of his OUD. To the contrary, the Complaint states that Plaintiff received ongoing and appropriate medical treatment during his hospitalizations. For example, following his August 22, 2020 procedure, for which Plaintiff was admitted to the Hospital on August 19, Plaintiff "recovered in the Hospital through August 26, 2020, during which time he was prescribed intravenous antibiotics." (*Id.* ¶¶ 66, 72.) These allegations undermine any inference that Plaintiff was denied medical services on the basis of his disability.

Nor does Plaintiff allege facts suggesting discriminatory animus. He does not, for example, allege that Hospital staff made derogatory comments about his disability, refused to treat him, or otherwise mistreated him on that basis. Instead, Plaintiff alleges only that Defendants declined to administer methadone and conclusorily characterizes that decision as "discriminatory." (*See* Am. Compl. ¶¶ 68–70, 144–146.) The mere allegation that Defendants were aware of Plaintiff's OUD and declined to administer methadone, without more, is insufficient to plausibly allege discrimination. Indeed, a provider's decision not to administer a particular medication—such as methadone—does not, standing alone, give rise to a plausible inference of discrimination. Absent factual allegations suggesting that Defendants' decision was motivated by bias rather than medical considerations, Plaintiff's claims amount to a disagreement with the course of treatment, which is insufficient for a disability discrimination claim. As courts have recognized, the antidiscrimination statutes do not federalize medical malpractice claims or second-guess treatment decisions

9

grounded in professional judgment. *Wimberly v. Atl. Dialysis Mgmt. Servs., LLC*, No. 24-CV-9269 (JPO), 2025 WL 1237546, at *5 (S.D.N.Y. Apr. 29, 2025), *reconsideration denied*, No. 24-CV-9269 (JPO), 2025 WL 1677757 (S.D.N.Y. June 13, 2025), *appeal dismissed* (Sept. 2, 2025) (explaining that extending the ADA and RA "into medical decision-making" would improperly require courts "to second-guess the determinations of medical providers" and exceed the statutes' intended scope); *see also Smith v. City of New York*, No. 15-CV-4493, 2016 WL 4574924, at *11 (S.D.N.Y. Sept. 1, 2016) ("It is well established that complaints about medical treatment are generally insufficient to state a claim under the ADA.") (citing *United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 156-60 (2d Cir. 1984)). Plaintiff argues that this case is not about medical malpractice, but rather about discrimination; however, while that may be true, that is a distinction without a difference in this context. OUD is a recognized disability, but it is also a complex mental health condition that providers may consider when determining an appropriate course of treatment, even if the patient is being treated for an unrelated condition and had been taking methadone upon admission. Medical providers often treat patients holistically—that is, all ailments are considered even when only one in particular is being treated. Simply alleging that the Hospital denied him methadone, without more as to the reasons why, is insufficient for a discrimination claim.

Plaintiff's disparate treatment claim also fails because he does not plausibly allege that he was treated less favorably than similarly situated individuals. The Complaint is devoid of any allegations that non-disabled patients, or patients without OUD, were provided methadone under similar circumstances. Without such comparator allegations—or other facts giving rise to an inference of differential treatment—Plaintiff cannot sustain a claim that he was treated less favorably because of his disability.

Finally, Plaintiff also fails to assert disparate impact on the basis of a failure-to-accommodate theory. Plaintiff does not plausibly allege that methadone was a reasonable accommodation necessary to afford him "meaningful access" to medical services. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 282 (2d Cir. 2003) ("A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought.") (quoting *Alexander v. Choate,* 469 U.S. 287, 301 (1985)). Rather, the Complaint reflects that Plaintiff received adequate care for his infection notwithstanding the denial of methadone.

Accordingly, because Plaintiff pleads no facts supporting a plausible inference that Defendants' refusal to administer methadone was motivated by discriminatory animus, constituted differential treatment, or resulted in a denial of meaningful access to medical services, his disability discrimination claims arising from the denial of methadone are dismissed.

### B.  PICC Line Denials

Plaintiff sufficiently pleads that Defendants discriminated against him on the basis of his OUD disability when they denied him home-based intravenous antibiotic treatment via a PICC line. As indicated *supra*, a plaintiff has a viable discrimination claim when their disability is ". . . unrelated to, and thus improper to the consideration of, the services in question." *McGugan*, 752 F.3d at 232 (internal citations omitted). Here, when refusing to discharge Plaintiff with a PICC line, Dr. Kapoor told Plaintiff that the refusal was because he would use the PICC line to inject drugs. (Am. Compl. ¶ 86.) Plaintiff further alleges that when he attempted to explain that he was in recovery and had been taking methadone for eight months, Dr. Kapoor remarked something to the effect of "I won't lose my license because of some junkie," another Hospital staff member said that "he would consider the PICC line to be easy access to use drugs," and yet another expressed

11

that "the team was concerned about sending [Plaintiff] home with a PICC line because of his substance use history." (*Id.* ¶¶ 88, 91, 93, 125.) From these remarks, the Court reasonably infers that Defendants assumed Plaintiff was actively abusing intravenous drugs because he has OUD. This unsubstantiated assumption appears to be what led Defendants to deny Plaintiff a PICC line.

The instant case is analogous to *Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006). In *Green*, the defendants forcibly hospitalized an ALS patient based on unfounded assumptions about the effects of ALS. *Id.* at 76–78. The court held that such reliance on unsupported beliefs constituted discrimination under the ADA. *Id.* In discussing *Green*, the court in *McGugan* explained that "[t]he plaintiff's physical paralysis, which disabled him from speaking, was irrelevant to his mental capacity to give or withhold consent to hospitalization. The defendants' decision to disregard the plaintiff's refusal, apparently based on an assumption having no basis in fact that [ALS] renders one incompetent to grant or withhold consent, was accordingly discriminatory in violation of Section 504." *McGugan*, 752 F.3d at 232. *McGugan* then distinguished *Green* because in *McGugan* the defendants' forcible treatment was not "based on improper considerations, unrelated to determining whether [the plaintiff] had a mental illness likely to result in serious harm to herself or others." *Id.* Instead, defendants' decision to forcibly hospitalize the plaintiff was grounded in relevant evidence, including plaintiff's confusion about who she was presently dating, prior violent conduct, unresponsiveness during evaluation, and a recent arrest following an in-flight incident. *Id.* Here, there are no comparable factual assertions to substantiate an assumption that Plaintiff would use the PICC line to use drugs beyond his past drug use nor are there assertions that Defendants attempted to confirm Plaintiff's representations about his condition, including by calling his opioid treatment program like Plaintiff requested. (Am. Compl. ¶ 87.)

Plaintiff further alleges he was denied a PICC line pursuant to the Hospital's policy of denying PICC lines to patients with a history of drug abuse. (Am. Compl. ¶ 85.) Several courts have held that such blanket treatment bans are likely discriminatory. *See, e.g.*, *P.G. v. Jefferson Cnty.*, 5:21-CV-388, 2021 WL 4059409, at *4–5 (N.D.N.Y. Sept. 7, 2021) (finding that a prisoner was likely discriminated against when denied methadone treatment under a prison policy banning such treatment for all non-pregnant prisoners); *Smith v. Aroostook Cnty.*, 376 F.Supp.3d 146, 159–60 (D. Me. 2019) ("The Defendants' out-of-hand, unjustified denial of the Plaintiff's request for her prescribed, necessary medication—and the general practice that precipitated that denial—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability."). Defendant's policy, as alleged, fails to consider patients' individualized needs and provides no accommodation for patients in recovery from substance abuse disorders, like Plaintiff. Rather, the policy bars all patients with a history of drug use from receiving home-based intravenous antibiotic treatment via a PICC line simply because they abused drugs in their past. Essentially, the policy assumes all patients with a history of drug use will use their PICC line to inject themselves with drugs. Such unjustified blanket denials of treatment are "so unreasonable as to raise an inference that Defendants denied [] Plaintiff's request because of [his] disability" in a discriminatory manner. *Aroostook Cnty.*, 376 F.Supp.3d at 160.

Defendants argue that Plaintiff's claims should be dismissed because their treatment decisions "precisely related" to Plaintiff's disability. (Def. Mem. of L. at 9.) In doing so, however, Defendants mischaracterize *McGugan*, which requires that challenged decisions be "based on factors that are unrelated to, and thus improper to the consideration of, the services in question." 752 F.3d at 232 (citations omitted). To be sure, Defendants' decision to deny Plaintiff a PICC line related to his OUD diagnosis, as Plaintiff alleges he was discharged without one "because of his

prior history of injection drug use." (Am. Compl. ¶ 81.) But the ADA does not foreclose claims simply because a plaintiff's disability is related to a medical decision nor does the statute require that the disability be wholly unrelated to the challenged conduct. By that logic, no treatment decision "relating" to a disability would ever be discriminatory, even when it may have been motivated by unfounded assumptions about the disability.

Defendants further argue that allowing Plaintiff's claims to proceed "would transform what would normally be a routine state claim of medical malpractice into a civil rights case every time the person who was subject to the alleged departure from accepted standards of care falls into a recognized 'disabled' category." (Def. Mem. of L. at 3.) As Defendants correctly observe—and as this Court has discussed *supra*—the Second Circuit has cautioned against recasting medical malpractice claims as federal discrimination claims. *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 954 (2d Cir. 2024); *McGugan*, 752 F.3d at 234. Nonetheless, that principle does not foreclose the possibility that a "departure from accepted standards of care" may also be motivated by discriminatory considerations or that a disabled individual who disagrees with a treatment decision may in fact have been discriminated against on the basis of their disability. While this Court has no intention of opening the floodgates to routine malpractice claims dressed in the garb of civil rights violations, this Court finds that Plaintiff has plausibly alleged that Defendants' conduct was driven not merely by medical judgment, but by impermissible assumptions about his disability. *See Twombly*, 550 U.S. at 570. ("[The Court does] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.")

Accordingly, Plaintiff's discrimination claims arising from the denial of home-based intravenous antibiotic treatment via a PICC line survive.

14

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. In particular, Defendants' motion is granted with respect to Plaintiff's claims concerning Defendants' denial of methadone treatment and denied with respect to Plaintiff's claims concerning Defendants' denial of home-based intravenous antibiotic treatment via a PICC line.

Plaintiff's claims concerning Defendants' denial of methadone treatment are dismissed without prejudice with Plaintiff granted leave to replead those claims in a Second Amended Complaint by April 30, 2026. If Plaintiff files a Second Amended Complaint by the Court-ordered deadline, Defendants are directed to answer or otherwise respond by May 21, 2026. If Plaintiff fails to file a Second Amended Complaint by the Court-ordered deadline, the claims dismissed without prejudice by this Opinion & Order will be deemed dismissed with prejudice. Defendants are directed to file an answer on or before May 21, 2026.

The Clerk of Court is kindly directed to terminate the motion at ECF No. 32.

SO ORDERED.

Dated: March 31, 2026
White Plains, New York

_____
Hon. Nelson S. Roman
U.S. District Court Judge, S.D.N.Y.